2009 Ark. App. 804

**Phillip ANDERSON and Mark
A. Stephens, Appellants**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 09–570.**

Court of Appeals of Arkansas.

Dec. 2, 2009.

Phyllis J. Lemons, Malvern, David R. Cannon, North Little Rock, for appellant.

Dustin McDanial, Att'y Gen., by: Brad Newman, Ass't Att'y Gen., for appellee.

RITA W. GRUBER, Judge.

Appellants Phillip Anderson and Mark A. Stephens were tried by a jury and were convicted of second-degree forgery. Anderson was sentenced to serve a term of sixty months' imprisonment in the Arkansas Department of Correction, and Stephens was sentenced to thirty-six months. Each appellant challenges the sufficiency of the evidence to support his conviction. Anderson raises two additional points, contending that the trial court erred in denying his motion to suppress evidence and abused its discretion in admitting certain testimony under Arkansas Rule of Evidence 404(b). We affirm.

Corporal Dennis Overton of the Arkansas State Police testified at trial that on August 13, 2008, he stopped an eastbound, high-end-model rental car with California tags just past Interstate 30's 100–mile marker because it was impeding the flow of traffic in the inside lane. He testified as follows regarding the stop, his own observations, and subsequent events that led to forgery charges being brought against both appellants.

Appellant Stephens, who was driving the car, and appellant Anderson, his passenger, presented Overton California identification cards in their own names, but they had no valid driver's licenses to show him. Each man appeared to be nervous. Overton asked Stephens to step out and meet him behind the car, where Overton could talk to him away from Anderson. Stephens told him he was visiting his mother in Hope and was going to Little Rock to shop and eat. Overton went back to the car, and Anderson gave him basically the same explanation about shopping in Little Rock. Overton asked Anderson why he was so well dressed while Stephens was only casually dressed, and Anderson replied that he had attended church that morning. Because the day was Tuesday, Overton thought the answer unusual.

Overton explained to the men that because there was no one present with a valid driver's license, state police policy required that their car be towed from the interstate. He called for a tow truck, had Anderson and Stephens stand in separate places on the highway's shoulder, and performed an inventory search of the car.

The glove box in front of Anderson's passenger seat contained an empty wallet and all its contents, apparently dumped out; there was no identification but some of the contents indicated that the wallet belonged to Anderson. Overton found checks "laid out ... almost like a deck of cards" on top of an open duffel bag in the trunk. They were printed on perforated paper and were grouped according to the name of each account-holder: Thomas Bell, Marc Woodyard, and David Roth. Each account displayed an account number and a California address. Stephens told the officer that the checks in the trunk were his, that he had printed them on his Home Depot computer, and that nothing was wrong with those activities.

Overton, remembering that Anderson's wallet had been dumped into the glove box, noticed him pacing nervously behind the patrol car. This behavior led Overton to believe that Anderson probably had a form of identification matching that on some of the checks. Overton approached him and asked if he had "any kind of other identity on him, or if he was armed, or carrying any kind of narcotics." Anderson replied in the negative. Overton asked for permission "to search his person for any of those items," and Anderson agreed.

Overton performed a brief pat-down, checking Anderson's pockets, and asked

him to take off his shoes. Anderson pulled off his left shoe and dumped it out. Then he took off his right shoe but simply left it on the ground. Overton found in it a California driver's license and a Discover card, both apparently fake, in the name Marc Woodyard, and showing identical California addresses. The photograph on the driver's license, however, was of Anderson. The checks from the shoe appeared to use the same logo and same paper as those in the car's trunk. All the checks at issue were introduced into evidence through Overton's testimony.

Overton was able later to determine from checking the Discover card's authenticity that it indeed was invalid. He testified that he also received from California copies of Anderson's and Stephens's driver's licenses, which he examined before bringing them to trial. He testified that the people shown on the licenses were the same men being tried in the courtroom. He also testified that he had compared Anderson's photograph with the Woodyard license formerly in Anderson's possession and determined them "the same."

Nancy Hollis, vice president for investigative services at Bank of America, Arkansas, testified as follows about her fraud investigation of some of the checks at issue. Roth had two accounts with the bank, withdrawals had been made from each, and Roth made police reports of the withdrawals. Although the Roth checks that Hollis investigated showed a valid name, their address was not valid, and he had reported to the bank fraudulent activity. Three unauthorized electronic-cash withdrawals had taken place on the account—one at Bank of America's Geyer Springs branch in Little Rock, another at the Levy branch in North Little Rock, and the last at the main bank in Mt. Pleasant, Texas.

Hollis explained that if a teller is convinced that a person who presents two pieces of identification and a valid account number is indeed the holder of the account, the person's withdrawal transaction on the account can be completed. Two withdrawals were made on the same day on accounts bearing Roth's name: one for $1500 at the Levy branch, and one for $3500 at Geyer Springs. A California driver's license and a Discover card were used as proof of identity in the Levy withdrawal; an Arkansas driver's license and a Discover card were used at Geyer Springs. A $3600 withdrawal occurred three days later at Mt. Pleasant.

It appeared to Hollis that Anderson was the person depicted in surveillance-camera photographs made at the Mt. Pleasant and Geyer Springs branches. The Geyer Springs photographs were made on August 19, 2008, at the time when a withdrawal on David Roth's account occurred there; the Mt. Pleasant withdrawal, however, occurred on August 22, 2008. Hollis was unable to obtain photographs from cameras at the Levy branch by the time of trial.

Hollis testified that all of the checks Stephens and Anderson had possessed bore the same Sandpiper logo. The logo also appeared on a separate Roth check that was under her investigation: she did not know whether it had been reported as a fraudulent transaction, where it had been cashed, or whether Roth had been notified of it. Hollis could validate only one of two account numbers that were shown on Marc Woodyard checks in the possession of Stephens and Anderson. They also had possessed checks showing Thomas Bell as the account holder, but the true account holder of the checks' account number was actually Thomas Ebel; his address in California was different than the one shown, and he had reported to Bank of America some

unauthorized activity on the account. Finally, there were two different account numbers on the Marc Woodyard checks that Stephens and Anderson had possessed; Hollis recognized only one account as legitimate, and there was report of no fraudulent activity on it.

### Substantial Evidence to Support Appellants' Convictions

Arkansas Code Annotated § 5–37–201(a) (Supp.2009) states that "[a] person forges a written instrument if, with purpose to defraud, the person makes, completes, alters, counterfeits, possesses, or utters any written instrument that purports to be or is calculated to ⌊6 become or to represent if completed the act of a person who did not authorize that act." Forgery of a check constitutes second-degree forgery. Ark. Code Ann. § 5–37–201(c)(1) (Supp.2009).

At the close of the State's case, both appellants moved for directed verdicts on the basis that there was no proof that their possession of checks and a credit card was unauthorized or that they intended to defraud anyone. The motions were denied. Neither appellant presented evidence in his own behalf.

■■■ A directed-verdict motion is a challenge to the sufficiency of the evidence. *Taylor v. State*, 77 Ark.App. 144, 72 S.W.3d 882 (2002). When the sufficiency of the evidence is challenged, we consider only the evidence that supports the verdict, viewing the evidence in the light most favorable to the State. The conviction will be affirmed if it is supported by substantial evidence, which is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or another. *Spight v. State*, 101 Ark.App. 400, 278 S.W.3d 599 (2008). Because intent is seldom shown by direct evidence and usually must be inferred from the circumstances surrounding the

crime, jurors are allowed to draw upon their common knowledge and experience to infer it from the circumstances. *Id.* Because of the obvious difficulty in ascertaining a defendant's intent, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.*

■■■ Appellants rely upon Arkansas cases reversing forgery convictions to argue that the State was required to present the account owners' testimony that they had not authorized appellants ⌊7 to possess and use their checks and credit card. In *Johnson v. State*, 236 Ark. 917, 370 S.W.2d 610 (1963), a handwriting expert's testimony constituted competent evidence that Johnson had signed the account holder's name on his check, but there was no evidence that he had not authorized Johnson to sign it. Likewise, in *Askew v. State*, 280 Ark. 304, 657 S.W.2d 540 (1983), the State presented no evidence that the signature was unauthorized. Those two cases are distinguishable from the present one, and they do not support the arguments now presented to us.

■■■ Stephens and Anderson argue that there was neither proof that they lacked authorization to possess forged items nor proof that they possessed the items for the purpose of defrauding the respective account holders. We do not agree. First, Roth and Ebel's reports of fraudulent activity on their accounts showed that Anderson was not authorized to access Roth's account and did so for the purpose of defrauding him. There were photographs and receipts showing that Anderson made three withdrawals from Roth's account within days of his arrest in Arkansas for forgery. Appellants possessed not only checks bearing the names of Roth, Ebel, and Woodyard, but also a Discover card and driver's license in Woodyard's name, the license bearing

Anderson's picture. Roth could not have authorized appellants to possess a fake driver's license. Further, proof that Anderson used a Discover card and driver's license when representing himself to be Roth suggests that the items bore Roth's name and Anderson's photograph. Finally, Stephens drove the car in which the fake checks and other documents were located, and he told Corporal Overton that the checks were his and he had printed them.

Neither do we find merit to an argument by Anderson that no fraudulent transactions occurred in Hot Spring County. Section 5-37-201(a) provides that merely possessing the forged items is sufficient to prove forgery. Thus, the circuit court properly denied a directed verdict for each appellant.

*Anderson's Motion to Suppress Evidence*

Anderson filed a pretrial motion to suppress evidence obtained by illegal search. The trial court conducted a suppression hearing, at which Overton testified essentially as he did at trial. Anderson argued that he had committed no offense to justify being searched, that the request to remove his shoes was beyond the scope of a pat-down search, and that the search of the car was illegal. The trial court denied the motion to suppress, ruling that Overton reasonably suspected criminal activity based upon his own observations, that Anderson freely consented to the search of his person, and that Anderson lacked standing to contest the search of the car.

In reviewing a circuit court's denial of a motion to suppress evidence, the appellate court conducts a de novo review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Baird v.*

*State,* 357 Ark. 508, 182 S.W.3d 136 (2004). The credibility of witnesses who testify at a suppression hearing is for the trial judge to determine, and the appellate court defers to that determination. *Id.*

Anderson argues on appeal only that he consented to nothing more than a pat-down search and that Corporal Overton's request that Anderson remove his shoes exceeded the scope of his consent. Anderson relies upon the holding of *Howe v. State,* 72 Ark.App. 466, 39 S.W.3d 467 (2001), that the seizure of a "hard ball" subsequently shown to be tin foil wrapped around methamphetamine exceeded the scope of an officer's pat-down search for weapons. Here, however, nothing suggests that Anderson attempted to limit the scope of the search or that Overton represented to him that its purpose was to check for weapons. The search was not a pat-down for officer safety but was for the purpose of determining if Anderson possessed anything related to the checks in the trunk of the car. Moreover, Overton suspected that something was amiss based upon what he had seen and on Anderson's nervous behavior. The Fourth Amendment is not implicated when a person voluntarily consents to a search of his person, and it is not even necessary that the officer have probable cause or reasonable suspicion to request consent for the search. *E.g., Chism v. State,* 312 Ark. 559, 853 S.W.2d 255 (1993); *see also Welch v. State,* 364 Ark. 324, 219 S.W.3d 156 (2005). Here, the circuit court correctly found that the search was proper and did not exceed the scope of consent based upon the purpose of the search, and we affirm the denial of Anderson's motion to suppress.

*Admission of Evidence of Anderson's Subsequent Acts and Photos under Rule 404(b)*

The circuit court overruled Anderson's objections before and during trial to Ms.

Hollis's testimony about his actions of making electronic transfers from Roth's account days after his Arkansas arrest and to surveillance photographs that appeared to show him as the person making those transactions at banks in Geyer Springs and Mt. Pleasant. The court ruled at the conclusion of the pretrial hearing that the records Hollis relied upon were the kind she normally relied upon in conducting bank business and making her decisions, and that her testimony about the fraudulent transactions was proper under Ark. R. Evid. 404(b) (2009).

 Under Ark. R. Evid. 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove character, but the evidence may be admissible for such purposes as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The rule applies to evidence of prior and subsequent bad acts. *Fitting v. State*, 94 Ark. App. 283, 229 S.W.3d 568 (2006). Trial courts are afforded wide discretion in evidentiary rulings; specifically, a trial court's ruling on issues relating to the admission of evidence under Rules 401, 403, and 404(b) is entitled to great weight and will not be reversed absent an abuse of discretion. *Id.*

Here, there was evidence that, within days of Anderson's arrest and his possession of a Discover card and driver's license in Woodyard's name, someone went to three Bank of America locations to withdraw money from Roth's account, using as identification a California driver's license and Discover card bearing his name. Surveillance photographs at two of the locations apparently showed Anderson to be the person, a determination that the jury could have made by comparing the photos with his actual person. The car in which Anderson was riding contained checks bearing Woodyard's and Roth's name, and

Roth had reported fraudulent action on his account. The circuit court properly admitted the disputed evidence under Rule 404(b) to show Anderson's motive, intent, plan, and knowledge. Because it was relevant for those purposes, its prejudicial effect did not outweigh its probative value.

Affirmed.

MARSHALL and HENRY, JJ., agree.